**Cynthia N. PETERSON, Plaintiff,**

v.

**The CITY COLLEGE, The City University of New York, Defendants.**

**No. 92 Civ. 7952 (DC).**

United States District Court, S.D. New York.

Jan. 21, 1999.

---

Anthony Feldmesser, New York City, Legal Aid Services for the Elderly, by Jonathan A. Weiss, New York City, for plaintiff.

Eliot Spitzer, Attorney General of the State of New York, by Judith T. Kramer, Assistant Attorney General, New York City.

## OPINION

CHIN, District Judge.

In this case, plaintiff Cynthia N. Peterson alleges that defendants The City College of the City of New York ("City College") and The City University of New York ("CUNY") engaged in a "text-book example of gender and age discrimination" by denying her tenure. Defendants move for summary judgment. Peterson moves, on the basis of defendants' alleged failures in discovery, to preclude defendants from offering any defense to her claims of discrimination and for sanctions.

In support of her broad claims of discrimination, Peterson offers no concrete evidence. Instead, she relies solely on her own, wholly conclusory affidavit. In contrast, defendants have come forward with substantial evidence to show that Peterson was denied tenure for legitimate, nondiscriminatory reasons. On the record before the Court, a reasonable jury could only conclude that Peterson was denied tenure not because of her gender or age but for legitimate, nondiscriminatory reasons.

Accordingly, defendants' motion for summary judgment is granted and the amended complaint is dismissed. Peterson's motion for sanctions is denied.

### BACKGROUND

#### A. *The Facts*

##### 1. *Employment Chronology*

##### a. *Initial Appointment (1973)*

City College's School of Architecture and Environmental Studies (the "SOA") hired Peterson in 1973 as an adjunct professor. (Defs.Am. 56.1 Statement ¶ 2). Peterson, who did not have any prior teaching experience, was a 1965 graduate of Yale University with a bachelor's and master's degree in architecture. (*Id.* ¶ 1; Solomon Aff.Ex. A at 1). Prior to teaching at City College, Peterson was employed by a number of architecture firms and also maintained her own practice. (Solomon Aff.Ex. A at 2). Peterson was rehired to various adjunct positions through the summer of 1986.

##### b. *Application for Tenure–Track Position (1982)*

In August 1982, Peterson applied for a full-time, tenure-track position at the SOA. (Defs.Am. 56.1 Statement ¶ 3). The SOA originally advertised three full-time positions in the Spring of 1982:(1) "Teaching in Structure and technical related subjects"; (2) "Archivist with teaching in History & Theory of Architecture"; and (3) "Design studio instruction and design methodology in basic years." (Solomon Aff.Ex. C). The positions were ranked in terms of departmental need. (*Id.*). For reasons that are not clear, however, the SOA could only fill one tenure-track position and one visiting full-time position.

Based on the SOA's needs, the Executive Committee, which was responsible for reviewing applications and making recommendations for appointments, decided that the tenure-track position should be filled by a candidate qualified to teach structure, and that the visiting line should be filled with an archivist. (*Id.*). Jonathan Ochshorn was selected by the Committee for the tenure-track position over Peterson and three other male candidates.

In a letter dated July 9, 1982 to City College's Director of Affirmative Action, Peterson contested Ochshorn's selection, claiming that her credentials for the position were stronger. (*Id.* Ex. B). Professor John Deans, Chairman of the Executive Committee, explained the Committee's reasons for selecting Ochshorn in a letter dated July 27, 1982. (*Id.* Ex. C). Deans explained that the Committee selected Ochshorn over the other candidates principally because he was the only candidate with a background in structure, who was prepared to teach structure classes in September 1982. Peterson was not prepared to teach structure in September 1982. Accordingly, the Committee did not recommend her appointment. (*Id.*).

The Office of the Vice Chancellor for Academic Affairs, however, declined to approve the appointment of Ochshorn as an assistant professor, ostensibly because he did not have a master's degree. (*Id.* ¶ 9). Peterson contends, without any evidentiary support, that Ochshorn was not appointed because the SOA withdrew the tenure-track position as a result of her complaint. (*See* Pl. Response to Defs. 56.1 Statement ¶¶ 4, 7).

##### c. *Application for Tenure–Track Position (1985)*

On March 11, 1985, Peterson again applied for a full-time tenure-track position. (Solomon Aff.Ex. D). The advertisement for the position stated that an applicant "should have experience in architectural practice and in teaching architectural technology and architectural design." (*Id.* Ex. E). Peterson contends that the job description for this position was written specifically for Alan Feigenberg, a younger male who was Assistant to the Dean at that time. (Pl. Response to Defs. 56.1 Statement ¶ 8). Neither Peterson nor Feigenberg, however, was selected for the position. Ultimately, a woman, Megan Lawrence, was selected and appointed.

When the SOA originally advertised the opening, three candidates applied: Feigenberg, Lawrence, and Peterson. The Executive Committee screened the candidates, interviewed them, and selected Lawrence for

the position. That selection was forwarded to the Personnel & Budget ("P & B") Committee. The P & B Committee reconsidered the candidates, and voted to recommend Peterson for the job instead of Lawrence.

The SOA's then-acting Dean, Donald E. Mintz, determined (in a detailed letter to both committees dated June 17, 1985) that the P & B Committee had the right and responsibility to reject recommendations of the Executive Committee, but that its authority "would be exceeded by introducing a candidate not recommended by the Executive Committee." (Solomon Aff.Ex. L). Dean Mintz decided, therefore, to disregard the P & B Committee's "rejection" of Lawrence, and accepted the Executive Committee's selection of Lawrence for the position. (Id.).

On June 19, 1985, Peterson filed a grievance with City College's Affirmative Action office, contesting the "hiring procedure" used for the 1985 position. (Id. Exs. F, I, J). A grievance panel was convened to investigate this matter and reported its conclusions in a December 4, 1985 letter addressed to City College's President. (Id. Ex. K). The panel determined that Dean Mintz's interpretation of the P & B Committee's role and responsibility was correct. Accordingly, the panel rejected the P & B Committee's "recommendation" of Peterson for the position.

In reaching that conclusion, the panel determined inter alia that all three candidates "had many years of experience in the department .... [and they] were all competent and eligible for the job." (Id.). Indeed, the "administrative faculty of the school neither expressed strong preference for a particular candidate nor the opinion that one was distinctly superior in credentials." (Id.).

Accordingly, in a letter dated January 10, 1986, the SOA's Dean, J. Max Bond Jr., notified Megan Lawrence that she had been selected for the position. (Id. Ex. G). Lawrence accepted the position in a letter dated January 20, 1986. (Id.).

On January 10, 1986, Bond offered Peterson a position as a non-tenure-track Assistant Professor on a substitute line for the remainder of the 1985–86 academic year. (Id. Ex. M). Peterson rejected the offer, and decided to continue in her adjunct position for the spring of 1986. (Id. Ex. N).

**d. Appointment to Tenure–Track Position (1986)**

Peterson was appointed to a full-time, tenure-track position as an Associate Professor at the SOA effective September 1, 1986. (Defs. Am. 56.1 Statement ¶¶ 2, 19). Bond officially offered Peterson the position in a letter dated September 9, 1986. (Solomon Aff.Ex. O).[1] The offer letter stated that the appointment was "subject to annual review and reappointment for one year periods until tenure is achieved." (Id.). It also stated that the "general terms and conditions of ... employment are regulated by the Bylaws of the Trustees of the City University." (Id.).

**2. Application for Tenure (1990–91)**

**a. Tenure Criteria and Confidentiality of Proceedings**

CUNY Bylaws provide that after serving for five full years, an Associate Professor "shall have tenure effective on the first day of September following his/her reappointment for the sixth full year." (Id. Ex. P).

CUNY's Statement of the Board of Higher Education on Academic Personnel Practice provides that tenure decisions "shall" be based on the following criteria: (1) teaching effectiveness ("clear evidence of the individual's ability and diligence as a teacher"); and (2) scholarship and professional growth ("[e]vidence of new and creative work shall be sought in the candidate's published research or in his instructional materials when they incorporate new ideas or scholarly research"). (Id. Ex. Q). In addition, the following factors "may be supplementary considerations": (1) service to the institution; and (2) service to the public. (Id.).

1. It is not clear whether Peterson specifically applied for this position. Bond's letter implies, however, that some formal selection process was undertaken because it states that he had "accept-

ed the recommendation of the Executive and [P & B] Committees ... and [was] offering [Peterson] appointment...." (Solomon Aff.Ex. O).

Appointment committee minutes on tenure decisions do *not* reflect the contents of the discussion as to an applicant. CUNY's Policy on Personnel & Budget Procedures, adopted by the Board of Higher Education in the City of New York on December 18, 1967 (the "Max–Kahn Policy"), provides that "actions upon motions, and not the discussion which led to such actions, should be recorded, unless the P & B should order, by a majority vote, that the discussions be recorded." (Solomon Sanctions Aff.Ex. E at ¶ B.1.a). Moreover, voting on such motions should be by "secret ballot." (*Id.*). The Max–Kahn Policy further directs that discussions on personnel actions in P & B meetings are confidential, and that it is "professional misconduct for a member of a P & B committee to disclose the substance or even the nature of the discussion at the P & B meeting." (*Id.* at B.2).

### b. *Peterson's Tenure Application and Denial*

Peterson applied for tenure during her fourth year (the 1989–1990 academic year) as a full-time Associate Professor so that the process for her reappointment with tenure could be considered and completed by December 1, 1990 (Peterson's fifth year—the 1990–1991 academic year), the deadline for notification of non-reappointment. (Defs.Am. 56.1 Statement ¶ 21). Among the materials considered by the various committees in passing on the tenure application were Peterson's: (1) personnel file (including at least three peer evaluations and one performance evaluation from Bond dated March 13, 1989); (2) curriculum vitae; and (3) work portfolio. (*See* Solomon Sanctions Aff.Ex. C; Solomon Aff.Ex. V).[2]

In the first stage of academic review for tenure, the Department Executive Committee votes twice on whether an applicant should be granted tenure. The Executive Committee rejected Peterson's tenure application in its two votes, which took place on February 3, 1990 and May 3, 1990. (*See* Defs.Am. 56.1 Statement ¶ 22; Solomon Aff. ¶ 24; Solomon Sanctions Aff.Ex. C; Irvine Aff. ¶ 5). The tally of the votes was 2–3–0–2 (yes-no-abstain-absent) for the first vote, and 1–4–0–2 for the second vote. (Irvine Aff. ¶ 5). Although the minutes for the February 3 and May 3, 1990 meetings could not be found, the following five faculty members were on the Executive Committee for the Spring of 1990: Gordon Gebert (Chair), Carmi Bee, Peter Gisolfi, John Loomis, and Ghislaine Hermanuz. There were also two students on the Executive Committee for the Spring of 1990, whose names are not known. (Solomon Sanctions Aff. ¶ 14).

Following the established review process, Peterson appealed the Executive Committee's decision to the SOA's Divisional P & B Committee. Her appeal was granted—the SOA P & B voted in favor of granting her tenure—in a 4–0–1–0 vote on May 9, 1990. (Irvine Aff. ¶ 5; Solomon Sanctions Aff. ¶ 13). The members of the SOA P & B Committee who voted on Peterson's appeal were Gebert, Barnett, Cordingley, Friedberg, and Ryder. (Solomon Sanctions Aff. ¶ 13).

In accordance with the established review process, Peterson's tenure application was next considered by the City College Review Committee (the "Review Committee"), a college-wide committee. The Review Committee overwhelmingly rejected Peterson's ten-

---

**2.** Peterson should have been, but was not, officially evaluated every year by the Chairman of the Executive Committee. (*See* Solomon Sanctions Aff.Ex. D art. 18.3(a)). But if an annual evaluation is not scheduled accordingly, it is the employee's responsibility to file an observation/conference form. (*Id.* art. 18.3(c)). Failure by an employee to file such a form bars the employee from complaining about any failure to schedule an annual evaluation appointment. There is no evidence that Peterson ever complied with this requirement. As to peer evaluations, observations for an entire class period are supposed to occur at least once during each aca-

demic semester. (*Id.* art. 18.2(b)). Again, it is the employee's responsibility to file an observation/conference form if the evaluations are not scheduled accordingly, and an employee may not subsequently complain concerning this requirement if she fails to file such form. (*Id.* art. 18.2(d)). Peterson's personnel file contains five teaching observation reports for the period after her tenure-track appointment, about one-half of the required number. (Solomon Sanctions Aff. ¶ 7). There is no evidence that Peterson ever filed an observation/conference form with respect to teaching observations.

ure application in a 1–8–0–1 vote on June 12, 1990. The voting members of the Review Committee were City College's Provost Robert Pfeffer and the ten Deans of the Schools and Divisions of the college as follows: (1) Leonard Beckum (Education); (2) Paul Sherwin (Humanities); (3) Edna Neuman (Nursing); (4) Jeffrey Rosen (Social Science); (5) J. Max Bond (Architecture); (6) Charles Watkins (Engineering); (7) Alan Fiellin (General Education and Guidance); (8) Virginia Red (Art); (9) George I. Lythcott (Medical); and (10) Michael Arons (Sciences). Arons was absent for the vote. (*Id.* ¶ 12).

On June 21, 1990 Dean Morris Silberberg of Faculty Relations officially notified Peterson of the Review Committee's recommendation that she not be reappointed with tenure, and that her employment at City College would end on August 13, 1991. (Solomon Aff.Ex. T). In the meantime, again in accordance with established procedures, Peterson appealed the Review Committee's decision to City College's president, Bernard W. Harleston.[3]

Harleston notified Peterson in a letter dated October 29, 1990 that "[a]fter a complete and thorough review of your curriculum vitae and the additional materials that came to my attention during your appeal, it is my academic judgment not to disturb the negative decision of [the Review Committee]." (*Id.* Ex. U).

On November 5, 1990, Peterson wrote to Harleston requesting an explanation for his denial of her appeal. Harleston responded in a letter dated November 14, 1990. (*Id.* Ex. V). He explained that in reaching his decision he reviewed Peterson's "record of teaching performance, productive scholarship, re-search and publications, professional activity and service to the College." (*Id.*). He concluded that Peterson's "achievements in the areas of scholarly productivity, research, publication and professional activity were not sufficient to warrant a tenure appointment." (*Id.*). In addition, he commented that peer teaching evaluations raised questions as to Peterson's level of technical experience and knowledge, level of design development, and knowledge of computer applications. (*Id.*).

At the same time Peterson was appealing her tenure denial to Harleston, on June 19, 1990, she also filed a Step I Grievance as to the same issue. (*See* Solomon Sanctions Aff. Ex. C (Step I Grievance form)). Silberberg denied Peterson's Step I grievance in a decision dated May 6, 1991. (*Id.* Ex. C (5/6/91 grievance decision)). Peterson filed a Step 2 grievance on May 9, 1991. Peterson later withdrew the Step 2 grievance. (*Id.* Ex. C (11/22/91 letter from University Director of Labor Hearings & Appeals)).

### 3. *Statistics*

During the last five years of Peterson's employment at the SOA, it hired nine full-time, tenure-track faculty members. (Solomon Aff. ¶¶ 32–34 and Exs. W, X).[4] Of those nine individuals, five (including Peterson) were women. Two of these women were tenured: (1) Labelle Prussin, who was hired with tenure (and subsequently resigned); and (2) Ghislaine Hermanuz, who was granted tenure in September 1991.

Of the nine individuals hired to tenure-track appointments, two were older than Peterson. (*Id.*). When Hermanuz was granted tenure in 1991, she was then 49 years old.

---

3. Silberberg, in a memorandum dated October 24, 1990 to Harleston, laid out the pertinent facts concerning Peterson and "prepared copies of pertinent documents taken from Peterson's personnel file" to help Harleston "review her appeal." (*See* Solomon Sanctions Aff.Ex. C (10/24/90 memo)). Silberberg commented that the Peterson case is "complicated by the fact that she worked as an adjunct for many years," and that such long service would "work against us in the grievance process." (*Id.*). Moreover, only one annual evaluation during her tenure-track appointment was prepared by Dean Bond in the spring of 1989. (*Id.*). Finally, Silberberg commented that Peterson's personnel file contained only about half the required number of peer classroom evaluations. (*Id.*).

4. The individuals hired are as follows: (1) Horst Berger (male; DOB ⁹⁄₂₈; hired 9/90); (2) Jerrilyn Dodds (female; DOB 2/51; hired 9/90); (3) Alan Feigenberg (male; DOB 4/44; hired 9/88); (4) Ghislaine Hermanuz (female; DOB 4/42; hired 9/86); (5) Megan Lawrence (female; deceased); (6) John Loomis (male; DOB 8/51; hired 9/88); (7) Cynthia Peterson (female; DOB 3/37; hired 9/86); (8) Labelle Prussin (female; DOB 1/29; hired with tenure 2/87; resigned); and (9) Leland Weintraub (male; DOB 11/51; hired 9/89).

Horst Berger was granted tenure in 1989 at the age of 63, and Alan Feigenberg was granted tenure in 1991 at the age of 47.

## B. *Prior Proceedings*

### 1. *Melani v. Board of Higher Education of the City of New York*, No. 73 Civ. 5434(LPG)

*Melani* was a class action against CUNY brought on behalf of female employees who alleged discrimination based on gender. The case was settled by a consent decree that became effective on September 10, 1984. The consent decree resolved "in full all claims against the defendant by the named plaintiffs and class members .... for damages, back pay, benefits, injunctive, declaratory or any other relief for the alleged unlawful discrimination, past and present, up to and including the effective date of th[e] Decree." (*Id.* Ex. Y). Peterson was a member of that class and is bound by that decree. (*See* Defs.Am. 56.1 Statement ¶¶ 32–35; Solomon Aff.Exs. Z, AA, BB, CC; Am.Cmplt. ¶¶ 1, 19, 26, 28).

Indeed, pursuant to the *Melani* consent decree, Peterson filed a "Claim Form for Subclass III Members" on January 12, 1985, in which she made "a verified claim of sex discrimination in denial of full-time employment on the instruction staff of [CUNY] on or after December 21, 1970 and up to September 10, 1984." (Solomon Aff.Ex. Z). Because no full-time appointments were made in Peterson's discipline during the relevant period, her claim was denied on October 29, 1985. (*Id.* Ex. AA). Peterson appealed on December 17, 1985. (*Id.* Ex. BB). In exchange for $1,750, however, Peterson agreed to withdraw her appeal on May 6, 1986. (*Id.* CC).[5]

### 2. *Prior Discrimination Charges*

Other than the claim in *Melani*, Peterson never filed any formal charges of discrimination against defendants concerning events that occurred prior to her full-time, tenure-track appointment in 1986. (Defs.Am. 56.1 Statement ¶ 18).

As to the denial of tenure, however, Peterson did file a charge of discrimination with the New York State Division of Human Rights and the EEOC on February 21, 1991. In that charge, Peterson alleged that she was denied tenure "because of my sex (Female) and because of my age (53) in violation of Title VII of the Civil Rights Act of 1964 ... and in violation of the Age Discrimination in Employment Act of 1967." (Solomon Aff.Ex. DD).

In a determination dated July 30, 1992, the EEOC held that defendants' "hiring and tenure appointments failed to show any disparate treatment of persons based upon sex," and that "the evidence obtained during the investigation does not establish a violation of [Title VII]." (*Id.* Ex. EE). The EEOC noted that during the course of Peterson's tenure-track employment at the SOA, the SOA hired nine full-time faculty on tenure lines, five of whom (including Peterson) were females. (*Id.*). In addition, in the prior five years, the SOA had granted tenure to more females than males.

Accordingly, the EEOC dismissed Peterson's complaint, at the same time giving her the right to sue in federal court. (*Id.*).

### 3. *The Instant Case*

Peterson, *pro se*, commenced suit by filing a complaint on October 29, 1992. The case was originally assigned to Judge Louis J. Freeh, but was reassigned to Judge Robert P. Patterson on August 19, 1993. Peterson subsequently obtained counsel (who agreed to take on the case at the request of the Court), and an amended complaint was filed on September 6, 1994. Peterson moved to compel the production of documents, which

---

**5.** Peterson contends that the withdrawal of her appeal "was moot, null and void because I was about to receive a full-time tenure track position through other means .... [and that she does not remember receiving] any funds or relief under the *Melanie* [sic] consent decree." (Peterson Aff. ¶ 25; *see also* Peterson Mem. at 2–3). It is not

clear what Peterson is attempting to establish by making this contention. There is no question that she was a member of the *Melani* class. Thus, Peterson is not entitled to relief in this case based on any claim of discrimination for conduct that pre-dates September 10, 1984.

was granted in part and denied in part in a decision dated November 18, 1994.

Thereafter, the case was reassigned to me. On July 21, 1995, Peterson moved for a contempt order and for sanctions alleging that defendants had failed to produce documents that were the subject of their previous motion to compel. In an order dated March 18, 1996, I denied that motion. In a conference with the parties on April 18, 1997, I set a final discovery deadline of September 12, 1997.

These motions followed.

## C. *The Parties' Allegations*

### 1. *Plaintiff*

Peterson alleges that the treatment she received by defendants was a "text-book example of gender and age discrimination, which worsened constantly and which was increased in retaliation for her successful pursuit of relief in a class action against defendants for gender bias." (Am. Cmplt.¶ 1). She does not set forth separate causes of action in her amended complaint, but asserts that jurisdiction is based on both Title VII, 42 U.S.C. § 2000e-5, and the Age Discrimination in Employment Act (the "ADEA"), 29 U.S.C. § 626(b). (*Id.* ¶¶ 3, 5). Thus, the amended complaint asserts claims for gender and age discrimination as well as retaliation. (*Id.* ¶¶ 1, 32; *see also* Peterson Aff. ¶¶ 14, 49; Pl. Response to Defs. 56.1 Statement ¶ 108; Pl.Mem. at 14–15).

It is unclear for what time period Peterson seeks relief. The amended complaint alleges discrimination as to defendants' 1982 and 1985 decisions not to select Peterson for a tenure-track position. In the prayer for relief, however, Peterson only seeks back pay to September 1991, when her employment with defendants ceased. (*See also* Pl.Mem. at 16 (apparently conceding that she is not entitled to relief for conduct prior to 1986, Peterson contends that the Court has jurisdiction to grant her relief "for defendants' discriminatory acts from the time she was appointed to a tenure-track position").

### 2. *Defendants*

Defendants contend that any discrimination claim based on actions that occurred prior to April 26, 1990 are time barred. (Defs.Mem. at 9–12). Defendants also contend that claims for acts prior to April 26, 1990 were not the subject of Peterson's EEOC charge, and are therefore jurisdictionally barred. (*Id.* at 12–14). Even assuming Peterson's claims concerning conduct that occurred prior to September 1984 are not defective, defendants contend that claims based on events during this time period are barred based on the *Melani* consent decree. (*Id.* at 15–17). Finally, defendants contend that, regardless of the Court's rulings concerning jurisdiction and the statute of limitations, Peterson's amended complaint must be dismissed on the merits. (*Id.* at 17–26).

Any claims based on events pre-dating the *Melani* decree are barred, as Peterson was a member of the class. Otherwise, however, solely for purposes of this motion, I assume that there are no viable statute of limitations and/or jurisdictional defenses to Peterson's claims. Thus, with respect to the events post-dating the *Melani* decree, I address only defendants' contention that summary judgment dismissing the amended complaint should be granted on the merits. I also assume, without deciding the issue, that Peterson would be entitled to rely on the 1982 and 1985 decisions at least as background evidence to support her claims of discrimination as to the denial of tenure.

## DISCUSSION

### A. *Legal Standards*

### 1. *Summary Judgment*

The standards governing motions for summary judgment are well-settled. Summary judgment may be granted when "there is no genuine issue as to any material fact and ... the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c); *see Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 585–87, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). Accordingly, the Court's task is not to "weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue

for trial." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 249, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). To create an issue for trial, there must be sufficient evidence in the record supporting a jury verdict in the nonmoving party's favor. *See id.* at 249–50, 106 S.Ct. 2505.

To defeat a motion for summary judgment, however, the nonmoving party "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita,* 475 U .S. at 586, 106 S.Ct. 1348. The nonmoving party may not rest upon mere "conclusory allegations or denials," but must set forth "concrete particulars" showing that a trial is needed. *National Union Fire Ins. Co. v. Deloach,* 708 F.Supp. 1371, 1379 (S.D.N.Y.1989) (quoting *R.G. Group, Inc. v. Horn & Hardart Co.,* 751 F.2d 69, 77 (2d Cir.1984)).

**2. *Title VII & ADEA Burdens of Proof***

■ The "ultimate issue" in an employment discrimination case is whether the plaintiff has met her burden of proving that the adverse employment decision was motivated at least in part by an "impermissible reason," that is, that there was discriminatory intent. *Fields v. New York State Office of Mental Retardation and Dev. Disabilities,* 115 F.3d 116, 119 (2d Cir.1997); *see St. Mary's Honor Center v. Hicks,* 509 U.S. 502, 507, 113 S.Ct. 2742, 125 L.Ed.2d 407 (1993); *Fisher v. Vassar College,* 114 F.3d 1332, 1336 (2d Cir.1997) (*en banc* ), *cert. denied,* —— U.S. ——, 118 S.Ct. 851, 139 L.Ed.2d 752 (1998). Plaintiffs have generally sought to meet that burden by using a "mixed-motives" analysis, *see de la Cruz v. New York City Human Resources Admin. Dep't of Soc. Servs.,* 82 F.3d 16, 23 (2d Cir.1996); *Tyler v. Bethlehem Steel Corp.,* 958 .F.2d 1176, 1181 (2d Cir.), *cert. denied,* 506 U.S. 826, 113 S.Ct. 82, 121 L.Ed.2d 46 (1992), or by proving "pretext" under the three-part test first enunciated by the Supreme Court in *McDonnell–Douglas Corp. v. Green,* 411 U.S. 792, 802, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973), *see Texas Dep't of Community Affairs v. Burdine,* 450 U.S. 248, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981); *de la Cruz,* 82 .F.3d at 20.

As articulated in recent years, the three-step *McDonnell–Douglas* test theoretically operates as follows. First, a plaintiff must establish a prima facie case of unlawful discrimination by showing that (1) he or she is a member of a protected class (2) who was qualified for his or her position (3) who suffered an adverse employment action (4) under circumstances giving rise to an inference of discrimination. *See McDonnell–Douglas,* 411 U.S. at 802, 93 S.Ct. 1817; *Shumway v. United Parcel Serv., Inc.,* 118 F.3d 60, 63 (2d Cir.1997). Second, if the plaintiff establishes a prima facie case, a rebuttable presumption of discrimination arises and the burden then "shifts" to the defendant to articulate a legitimate, nondiscriminatory reason for the employment decision. *See Stratton v. Dep't for the Aging for the City of New York,* 132 F.3d 869, 879 (2d Cir.1997); *Fisher,* 114 F.3d at 1335–36. Third, if the defendant articulates a nondiscriminatory reason for its actions, the presumption of discrimination is rebutted and it "simply drops out of the picture." *St. Mary's,* 509 U.S. at 510–11, 113 S.Ct. 2742. The plaintiff must then show, without the benefit of any presumptions, that it is more likely than not that the employer's decision was motivated at least in part by a discriminatory reason. Because the defendant has at this point offered a nondiscriminatory reason for its actions, the plaintiff must show that the proffered reason is in reality a pretext for unlawful discrimination. *See Fisher,* 114 F.3d at 1337.

Although the *McDonnell–Douglas* framework has been with us for some twenty-five years, it has proven at times to be confusing and unworkable. *See, e.g., Norton v. Sam's Club,* 145 F.3d 114, 118 (2d Cir.), *cert. denied,* —— U.S. ——, 119 S.Ct. 511, 142 L.Ed.2d 424 (1998) (describing cases interpreting *McDonnell Douglas* as a "thick accretion" that "should not obscure the simple principle that" the plaintiff has the ultimate burden of persuasion in discrimination cases); *Greenway v. Buffalo Hilton Hotel,* 143 F.3d 47, 53 (2d Cir.1998) (commenting that requiring juries to "play the ping-pong-like match of shifting burdens is confusing"). For this reason, I believe that the *McDonnell–Douglas* test has outlived its usefulness

and should be discarded. Instead, courts should focus on the "ultimate issue"—whether the plaintiff has proven that it is more likely than not that the employer's decision was motivated at least in part by an "impermissible," or discriminatory, reason. *See generally* Denny Chin & Jodi Golinsky, *Moving Beyond McDonnell Douglas: A Simplified Method for Assessing Evidence in Discrimination Cases,* 64 Brook.L.Rev. 659 (1998); *Lapsley v. Columbia Univ.,* 999 F.Supp. 506, 513–16 (S.D.N.Y.1998).

In the summary judgment context, a more direct approach would refocus attention on what should be the central inquiry: the evidence, or lack of evidence, of discrimination in a particular case. In considering a summary judgment motion, courts should address the ultimate issue by examining whether the plaintiff has presented sufficient evidence to permit a reasonable jury to conclude that a defendant's decisions were motivated at least in part by an impermissible reason. *See Fisher,* 114 F.3d at 1347. The court should conduct this inquiry in the following manner: first, by evaluating plaintiff's proof, direct or otherwise, of discrimination; second, by evaluating defendant's proof that it did not discriminate, including evidence of defendant's explanations for its decisions; and third, by considering the evidence as a whole, resolving all conflicts in the proof and drawing all reasonable inferences in favor of the plaintiff.

In considering the ultimate issue, a factfinder at trial or a court considering a motion for summary judgment must bear two concepts in mind. First, the issue is intentional discrimination—the plaintiff has the burden at all times of proving, by a preponderance of the evidence, that he or she was the victim of intentional discrimination. *See St. Mary's,* 509 U.S. at 507, 113 S.Ct. 2742 (stating that the "ultimate burden of persuading the trier of fact that the defendant intentionally discriminated against the plaintiff remains at all times with the plaintiff") (quoting *Burdine,* 450 U.S. at 253, 101 S.Ct. 1089)). It is not enough that the plaintiff was unfairly treated or that a defendant's stated reasons for its employment actions are proven to be pretextual. Rather, while unfair treatment and a

defendant's false statements may constitute "pieces of circumstantial evidence" that support a claim of intentional discrimination, the evidence as a whole must be sufficient to sustain an "ultimate finding" of intentional discrimination. *Fisher,* 114 F.3d at 1338.

Second, at the same time, proof of intentional discrimination is often elusive. Because an employer's "intent and state of mind are implicated," *Meiri v. Dacon,* 759 F.2d 989, 998 (2d Cir.), *cert. denied,* 474 U.S. 829, 106 S.Ct. 91, 88 L.Ed.2d 74 (1985), "direct, smoking gun, evidence of discrimination" is rarely available. *Richards v. New York City Bd. of Educ.,* 668 F.Supp. 259, 265 (S.D.N.Y.1987), *aff'd,* 842 F.2d 1288 (2d Cir. 1988). Courts must continue to be mindful that "'clever men may easily conceal their motivations.'" *Robinson v. 12 Lofts Realty, Inc.,* 610 F.2d 1032, 1043 (2d Cir.1979) (quoting *United States v. City of Black Jack,* 508 F.2d 1179, 1185 (8th Cir.1974), *cert. denied,* 422 U.S. 1042, 95 S.Ct. 2656, 45 L.Ed.2d 694 (1975)); *accord Ramseur v. Chase Manhattan Bank,* 865 F.2d 460, 465 (2d Cir.1989); *see also Tyler,* 958 F.2d at 1187 ("[If] there is at the very least a thick cloud of smoke," an employer must "convince the factfinder that, despite the smoke, there is no fire.") (quoting *Price Waterhouse v. Hopkins,* 490 U.S. 228, 266, 109 S.Ct. 1775, 104 L.Ed.2d 268 (1989)). All a plaintiff need do is persuade a finder of fact, from all the evidence in the record, that it is more likely than not that the adverse employment decision was motivated at least in part by an impermissible reason.

### 3. *Tenure Denial*

The Second Circuit has "repeatedly noted that tenure decisions involve unique factors that set them apart from other employment decisions." *Batra v. Pace Univ.,* No. 90 Civ. 4315, 1998 WL 684621, at *7 (S.D.N.Y. Sept.30, 1998) (citing *Fisher v. Vassar College,* 70 F.3d 1420, 1434–35 (2d Cir.1995), *reh'g en banc,* 114 F.3d 1332 (2d Cir.1997), *cert. denied,* —— U.S. ——, 118 S.Ct. 851, 139 L.Ed.2d 752 (1998); *Zahorik v. Cornell Univ.,* 729 F.2d 85, 92 (2d Cir.1984); *Lieberman v. Gant,* 630 F.2d 60 (2d Cir.1980)). Because tenure decisions "involve a myriad of considerations and are made by numerous

individuals and committees over a lengthy period of time, a plaintiff 'faces an uphill battle in her efforts to prove discrimination ... in the refusal to grant her tenure.'" *Id.* (quoting *Kawatra v. Medgar Evers College*, No. 86 Civ.1946, 1997 WL 722703, at *5 (E.D.N.Y. Sept.25, 1997)).

██ Thus, even though tenure decisions are not immune from review under Title VII or the ADEA, a court "should exercise caution in second-guessing a tenure decision and should not 'sit as a super tenure-review committee.'" *Id.* (quoting *Negussey v. Syracuse Univ.*, No. 95 Civ. 1827, 1997 WL 141679, at *6 (N.D.N.Y. Mar.24, 1997)); *see also Jalal v. Columbia Univ.*, 4 F.Supp.2d 224, 235 (S.D.N.Y.1998) ("judges are frequently admonished not to second-guess the merits of a university's collective academic judgment as to a tenure candidate's qualifications") (citations omitted).

## B. *Application*

██ Because the *McDonnell–Douglas* test remains governing law, I am bound to apply it. Rather than do so formalistically, however, I assume that Peterson has made out a prima facie case. Defendants have articulated legitimate, nondiscriminatory reasons for their action—Peterson was denied tenure because, in the estimation of defendants' Executive Committee, Review Committee, and President, she failed to meet the required academic criteria. Hence, I proceed directly to the ultimate question: whether Peterson has presented sufficient evidence from which a reasonable jury could find discrimination. I do so by reviewing first plaintiff's evidence, then defendants' evidence, and finally the record as a whole.

### 1. *Plaintiff's Evidence*

Peterson's evidence of discrimination is extremely thin. She provides no documents, no quantifiable statistics, no statements, no depositions, and no affidavits other than her own conclusory affidavit, consisting primarily of speculation. She points to no circumstances, such as unexplained adverse treatment, that could give rise to an inference of intent to discriminate. Construing the facts in the light most favorable to her, and drawing all reasonable inferences in her favor, there are three broad categories of circumstantial evidence that Peterson contends support her discrimination claims: (1) her credentials are stronger than those of her peers/colleagues; (2) there were irregularities in the tenure review process; and (3) there is a "pattern" of purportedly discriminatory treatment by defendants against both women and older people. I discuss each of these categories in turn.

### a. *Peterson's Credentials*

Peterson repeatedly alleges that her qualifications, work performance, professional experience, and service to the SOA exceeded those of her colleagues.

First, Peterson alleges that she was more qualified than Jonathan Ochshorn (a younger man) for a full-time, tenure-track position in 1982. Yet, defendants recommended Ochshorn for the position over her. Second, Peterson alleges that she was the most qualified candidate for the 1985 tenure-track position, to which she was not appointed. Both the younger female candidate, who was selected and appointed, and the younger male candidate, who was not selected, are alleged to have been less qualified than Peterson for the position. Third, Peterson alleges that the younger female who was granted tenure the year that Peterson was denied tenure is less qualified than Peterson. Finally, Peterson also alleges that she carried a heavier courseload and was more involved in SOA activities than her colleagues.

All of these allegations are debatable. Evidence in the record establishes, as least with respect to Megan Lawrence, Alan Feigenberg, Horst Berger, and Ghislaine Hermanuz, that these individuals are or were distinguished scholars and candidates in their own right. (*See* Kramer Aff. Exs. 1–6; Solomon Aff. Ex. K).

Nonetheless, I assume for purposes of this motion that Peterson's allegations concerning her superior credentials are true. Even if true, however, these allegations do not, by themselves, prove discrimination. Even assuming, for example, that Ochshorn was an "inferior" candidate because he did not have

a master's degree, he had experience in "structure" and was ready to teach structure, whereas Peterson had no such experience and could not have taught the course. Hence, the fact that defendants initially chose Ochshorn over Peterson is hardly proof of discrimination. .

### b. *Irregularity in Process*

Peterson next contends that defendants' tenure decision was flawed due to a number of "irregularities" in the process. For instance, Peterson's personnel file does not contain the requisite number of evaluations. In addition, Peterson disagrees with Professor David Guise's peer evaluation, which was considered by defendants in denying tenure. Guise's evaluation stated *inter alia* that "*every* single drawing I viewed ... which were secured on the wall, contained major errors." (Solomon Aff. Ex. R (emphasis in original)). Peterson contends that Guise was "biased" against her.

In addition, Peterson alleges that the Executive Committee (that twice voted *against* her tenure application) was not properly staffed. She notes that two members of the Committee had to remove themselves because they were not tenured at the time (John Loomis and Ghislaine Hermanuz). (Peterson Aff. ¶ 41). She also alleges that "[f]or the only time in the Executive Committee's history, two students were improperly permitted to vote on my tenure review." (*Id.*). As to the Review Committee's nearly unanimous decision *against* tenure, Peterson alleges that the Review Committee "ignor[ed]" the SOA's review process and that she "has no idea which members of defendants' Review Committee voted on [her] tenure or whether even a proper vote was taken." (*Id.* ¶ 44).

At best, these contentions are also debatable for a number of reasons. First, while it is true that Peterson's personnel file contained less than the required number of evaluations, Peterson does not contend that she ever complained about the scheduling of annual evaluations and/or teaching observations. (*See supra* note 2). Rather, she maintains that additional evaluations of her performance exist, but that defendants have improperly withheld these documents from her. As will be discussed more fully below, I do not find that defendants have withheld documents from Peterson.

Second, there is no evidence to support the contention that Guise's critical evaluation of Peterson was somehow tainted because he was "biased" against her. Even if it were true that Guise was "biased" against Peterson, there is no allegation that Guise was biased against Peterson because of her gender *or* age. Moreover, he later wrote unsolicited letters supporting her tenure application. Gebert's Chairman's Report, in which he recommends Peterson for tenure, states that "[p]eer observations ... are not uniformly positive, though one evaluator [presumably Guise] later felt it prudent to moderate his negative remarks in several unsolicited letters." (Kramer Aff. Ex. 7). In addition, Guise's evaluation was not the only evaluation considered. Other peer evaluations of Peterson also contained negative comments. (*See* Solomon Aff. Exs. S, V).

Finally, even if there are questions concerning the members of the Executive Committee who voted on her tenure application, there is not a scintilla of evidence to suggest that the proper process concerning Peterson's tenure application was ignored. There is also no evidence whatsoever to suggest that the Review Committee's vote was somehow improper. (*See* Solomon Aff. Exs. V, X, EE; Irvine Aff.; Solomon Sanctions Aff. ¶ 12 and Ex. C).

Accordingly, Peterson has at best demonstrated that there were some minor irregularities as to her tenure review. Even so, however, there is nothing in the record to even remotely suggest that these "irregularities" were motivated by discriminatory animus against Peterson on the basis of her gender and/or her age.

### c. *Pattern of Discrimination*

To support her sweeping claims of discrimination, Peterson repeatedly alleges that defendants engaged in a pattern of discriminatory conduct on the basis of both gender and age. Peterson, however, provides absolutely

no concrete evidence—direct or indirect—to support these wholly conclusory allegations.

For instance, Peterson alleges that Megan Lawrence was selected and appointed to a tenure-track position over Peterson, in 1985, "because [defendants] were under pressure to hire a woman, but knew that [Lawrence] would be unable to assume the position" because she was "dying from cancer." (Peterson Aff. ¶¶ 20–22). Although it is true that Lawrence passed away after her appointment (*see* Solomon Aff. Ex. W), there is not a shred of proof in the record to substantiate this conclusory speculation as to why defendants hired Lawrence or even that defendants knew Lawrence was sick. Peterson does not identify any source of information as to this contention, nor does she contend that she had personal knowledge of the alleged circumstances surrounding Lawrence's appointment. The suggestion that defendants hired Lawrence precisely because they *knew* that she was going to die is absurd.

Another glaring example of Peterson's lack of concrete evidence as to purported discrimination is her contention concerning Labelle Prussin, a *woman* who is *older* than Peterson and who was hired *with tenure* in 1986. Peterson contends that Prussin resigned in 1990 "because of the repeatedly bad treatment she received [at the SOA] because of her gender." (Peterson Aff. ¶ 46). Peterson also alleges that Prussin attempted to rescind her resignation but the SOA refused to let her rescind it, so "she was forced out." (*Id.*).

Again, Peterson does not offer a single bit of evidence to support this speculation. She does not offer an affidavit from Prussin or any other member of the faculty familiar with the alleged events in question. She does not explain how she purportedly knew this information concerning Prussin. She does not identify a single source of information. Finally, she does not identify any of the parties involved in the "repeatedly bad treatment" or even what the treatment was or how it was related to Prussin's gender.

In short, Peterson has utterly failed to present evidence of discrimination or any pattern of discriminatory conduct. Although she speculates that every action affecting her was based on discriminatory animus, she offers nothing substantive to prove it. Indeed, statistics and other evidence in the record demonstrate no pattern of discriminatory conduct by defendants on the basis of gender and/or age.

### 2. *Defendants' Evidence*

Defendants rely on evidence tending to show that Peterson was denied tenure for legitimate non-discriminatory reasons. That evidence is substantial.

For instance, Harleston, upon reviewing the entire record concerning Peterson's tenure application, concluded that Peterson's:

> overall record does not provide evidence of a potential for performance at a level that I would expect of faculty members in the School of Architecture being considered for tenure at th[e] time. It was my academic judgment that [Peterson's] achievements in the areas of scholarly productivity, research, publication and professional activity were not sufficient to warrant a tenure appointment. During the past five year period [Peterson's] record of professional accomplishments, publications, and/or research activities have been extremely limited in quantity and importance. There has been no direct contribution to the professional literature. I found [therefore] that [Peterson's] work in these areas did not constitute a body of accomplishments that would add to [Peterson's] status in the profession or would contribute to the future growth and instructional needs of the [SOA].

(Solomon Aff. Ex. V).

Gebert, who *recommended* that Peterson be reappointed with tenure, conceded the following in his "Chairman's Report" that was considered by the Review Committee and Harleston:

> Peterson's professional activities have decreased substantially in the time since she obtained a full-time position in the School.... The Departmental Executive Committee [of which Gebert was a member] voiced a great deal of concern regarding Prof. Peterson's diminished accomplishments in the areas of professional

work and scholarship as well as her effectiveness as a teacher in the past several years. The [P & B] Committee [of which Gebert was also a member] devoted less discussion to this issue, wishing instead to emphasize Prof. Peterson's length of service. The question remains: Is Prof. Peterson's relatively attenuated professional development in the past several years a relatively short-lived aberration or a long-term downward trend?

(Kramer Aff. Ex. 7).

Countless other exhibits in this case demonstrate that legitimate, non-discriminatory reasons existed to justify Peterson's denial of tenure. (*See* Solomon Aff. Exs. A at 10, Q, R, S, V). Moreover, despite Peterson's emphasis on her service to the SOA, she does not dispute the fact that the primary criteria for tenure decisions were teaching effectiveness and scholarship and professional growth. (*See* Solomon Aff. Ex. Q). Factors such as service to the institution and service to the public are only "supplementary considerations." (*Id.*). Noticeably absent from Peterson's contentions regarding her superior qualifications is *any* allegation as to her accomplishments in the area of scholarly work, particularly academic publication.

In short, defendants' evidence of legitimate, nondiscriminatory reasons for denying tenure is compelling.

### 3. *The Record as a Whole*

In the end, Peterson's "evidence" of gender and/or age discrimination is virtually non-existent. Even assuming that she was more qualified than her colleagues and that there were some minor irregularities in her tenure review, no rational jury could conclude, on the basis of the record as a whole, that she was discriminated against because of her gender and/or her age. Simply put, Peterson has not come forward with sufficient evidence to raise an issue of fact for trial. . . .

Peterson contends in her opposition that "[t]here is adequate evidence in the record to

show, at minimum, a genuine issue of fact exists as to whether Ms. Peterson's purported failure to have sufficient scholarly works or professional accomplishments were the true reason defendants' denied her tenure ... and that they were motivated at least in part by discriminatory animus." (Pl.Mem. at 14). While Peterson conclusorily alleges the existence of "adequate evidence in the record" to raise an issue of fact, she utterly fails to point to any such evidence.[6]

Moreover, Peterson's conclusory, unsupported allegations of discrimination are countered by defendants' concrete and specific proof that its conduct was legitimate and lawful. *See Woroski v. Nashua Corp.*, 31 F.3d 105, 109–10 (2d Cir.1994) ("some evidence is not sufficient to withstand a properly supported motion for summary judgment; a plaintiff opposing such a motion must produce sufficient evidence to support a rational finding that the legitimate, nondiscriminatory reasons proffered by the employer were false, and that more likely than not the [alleged unlawful reason] was the real reason for the [employment decision]").

To merit a trial on Peterson's claims, the evidence must show that, more likely than not, defendants' "proffered reason was not the true reason for the employment decision." *Fisher v. Vassar College*, 114 F.3d 1332, 1336 (2d Cir.1997) (*en banc*), *cert. denied*, — U.S. —, 118 S.Ct. 851, 139 L.Ed.2d 752 (1998) (quoting *St. Mary's*, 509 U.S. 502, 507–08, 113 S.Ct. 2742, 125 L.Ed.2d 407 (1993)). There is no evidence to suggest that defendants' proffered reason for denying tenure was not the true reason tenure was denied. Although Peterson has arguably presented some evidence of pretext (*i.e.*, superior qualifications and minor irregularities in the tenure process), it is undermined by the evidence that defendants have submitted. Even assuming that a reasonable jury could find pretext, no reasonable jury could conclude that the pretext was a mask for illegal discrimination.

---

6. It is telling that in her 56.1 Statement, Peterson cites only to her own affidavit, with the exception of four citations to defendants' exhibits (including, exhibits concerning Lawrence's appointment (Exs.K, L); CUNY's tenure policy (Ex. Q); and one peer evaluation containing a positive remark about Peterson (Ex. S)).

In sum, Peterson's tenure application was carefully considered by individuals who were, for the most part, intimately familiar with her qualifications and the needs of the institution. These individuals were, for the most part, eminently qualified to judge such issues as the scholarliness of Peterson's work and the strength of her contributions to her field of study. These individuals participated in four separate levels of review and deliberation. Yet, Peterson now wants this Court to step in and provide her with a fifth level of review and to "second-guess" the tenure decision. While the Court would not hesitate to do so were there concrete and specific evidence of discrimination, no such evidence has been presented in this case. Accordingly, there is no basis upon which to disturb defendants' decision to deny tenure here, and no reasonable jury could conclude that Peterson was denied tenure for a discriminatory reason.

### 4. *Rule 56(f)*

■ Although Peterson does not explicitly invoke Fed.R.Civ.P. 56(f) in opposing defendants' motion for summary judgment, the contentions she makes in opposition (and in her motion for sanctions) implicitly raise the issue as to whether she has been afforded a reasonable opportunity to conduct discovery.

On the record before me, I conclude that Peterson has been afforded a full and fair opportunity to conduct discovery in this case. *Cf. Meloff v. New York Life Ins. Co.,* 51 F.3d 372 374–76 (2d Cir.1995) (vacating summary judgment where plaintiff demonstrated a lack of opportunity to conduct discovery). Indeed, Peterson had some five years in which to conduct discovery. Although she continues to complain that defendants have failed to produce requested documents, I find that defendants have substantially complied with their obligations in discovery. Indeed, defendants made approximately ten boxes of documents available for Peterson to inspect (culled from approximately 60 boxes of archived files), but she chose to inspect only one of the ten boxes. Moreover, Peterson cannot be heard to complain in this respect because the record does not reflect that she conducted any depositions.

Accordingly, to the extent that Peterson's opposition suggests that she has not had a full and fair opportunity to conduct discovery, the argument is rejected.

For all the reasons stated above, defendants are entitled to summary judgment dismissing Peterson's discrimination claims.

### C. *Retaliation*

■ Peterson also alleges that she was denied tenure "in retaliation for her successful pursuit for relief in a class action against defendants for gender bias" and in retaliation for "protesting discrimination" based on gender and/or age. (Am.Cmplt.¶¶ 1, 32). To prevail on a claim of retaliation, Peterson must demonstrate that: (1) she was engaged in protected activity; (2) defendants were aware of the activity; (3) defendants took some adverse employment action against her; and (4) a causal connection exists between her participation in a protected activity and the adverse employment action. *See Lapsley v. Columbia Univ.,* 999 F.Supp. 506, 524 (S.D.N.Y.1998) (citing *Galdieri–Ambrosini v. National Realty and Dev. Corp.,* 136 F.3d 276, 292 (2d Cir.1998)).

■ Construing the amended complaint in the light most favorable to Peterson, she has alleged protected activity in this case by noting her participation in the *Melani* case as well as other alleged conduct to "protest[ ] discrimination." (Am.Cmplt.¶ 32). She also alleges causation, as she contends that she was denied tenure in retaliation for her protected activity.

These allegations, however, are purely conclusory with no concrete support. Just as there is no support for her discrimination claims, there is no support for her claim of retaliation. In the face of defendants' concrete showing that they denied Peterson tenure for legitimate, non-discriminatory reasons, no reasonable juror could conclude that the tenure decision was retaliatory. Accordingly, the claim for retaliation is dismissed as well.

### D. *Plaintiff's Motion*

■ Upon review and consideration of Peterson's motion for sanctions (and to pre-

clude defendants from offering a defense), the Court finds no basis upon which to grant the relief requested.

Peterson first moved to compel production of documents in September 1994. That motion was granted in part and denied in part by Judge Patterson in a memorandum decision dated November 15, 1994. (Feldmesser Sanctions Aff. Ex. B). A year and a half later, after the case was reassigned to me, Peterson moved for sanctions and fees alleging that defendants failed to comply with the November 1994 decision ordering production.

In an order dated March 14, 1996, I denied the motion "in all respects." I determined that there was a delay in the production of documents in part because of difficulties in negotiating and executing a confidentiality agreement. Even though those difficulties appeared to have been resolved at a conference before Judge Patterson on February 17, 1995, "counsel continued to bicker about the terms of the confidentiality agreement." (*See* 3/14/96 Order at 1). In view of the circumstances, I found that defendants did not act contemptuously. (*Id.* at 2). I denied Peterson's fee request as did Judge Patterson when Peterson originally moved to compel documents in 1994.

On April 18, 1997, I held a status conference. At the conference, Peterson's counsel presented a chart containing specific documents that they wanted defendants to produce. (Feldmesser Sanctions Aff. Ex. C). I ordered defendants to produce the documents identified in the chart by June 2, 1997. I also order that all discovery in this case be completed by September 12, 1997.

In connection with Peterson's current sanctions motion, defendants represent that "all of the documents requested by plaintiff have been the subject of a diligent search of CUNY Central Office and City College files. All that were located were either produced directly to plaintiff or produced for inspection." (Solomon Sanctions Aff. ¶ 2 and Ex. B; Feldmesser Sanctions Aff. Ex. D). Defendants deny that they have destroyed documents or have refused to produce documents. (Solomon Sanctions Aff. ¶ 2). I accept these representations. Not only have defendants provided proof that

they have complied with Peterson's production requests in this case, again, it appears that Peterson has not even examined all of the documents that were made available to her by defendants. (*See* Solomon Sanctions Aff. ¶¶ 4–15; Kramer Sanctions Aff. ¶¶ 9–11).

Accordingly, the request for sanctions is denied. The motion to preclude defendants from asserting a defense in this case, in any event, is moot.

### CONCLUSION

Defendants' motion is granted and the amended complaint is dismissed with prejudice. The Clerk of the Court shall enter judgment accordingly. Plaintiff's motion is denied.

SO ORDERED.