Bahjat BESHTY, Plaintiff,

v.

GENERAL MOTORS, Defendant.

No. 02–CV–6218L.

United States District Court, W.D. New York.

July 6, 2004.

Patrick J. Solomon, Dolin, Thomas & Solomon LLP, Rochester, NY, for Plaintiff.

James M.L. Ferber, Alison M. Day, Littler Mendelson, P.C., Columbus, OH, James C. Holahan, Rochester, NY, for Defendant.

## DECISION AND ORDER

LARIMER, District Judge.

Plaintiff, Bahjat Beshty, brings this action against his former employer, General Motors Corporation ("GM"), alleging various discrimination and other claims in connection with his termination from employment in October 2000. GM has moved for summary judgment dismissing the complaint, and plaintiff has cross-moved for summary judgment on one claim under New York Labor Law § 193.

## BACKGROUND

Plaintiff is a male United States citizen, born in 1938, of Arab descent, Libyan national origin, and Muslim religion. During most of the 1990s, plaintiff was employed in various capacities at Merck & Company ("Merck") in New Jersey. He alleges that in May 1999, at the express direction of GM, a recruiter contacted plaintiff to seek his employment at GM's Global Alternative Propulsion Center ("GAPC") in Honeoye Falls, New York. At that time plaintiff was a senior project engineer at Merck, with a base salary of about $92,000 per year.

The recruiter informed plaintiff that Gerald Voecks, whom plaintiff knew from a previous job, was involved in a fuel cell research project ("the project") at GAPC, and that Voecks wanted to know if plaintiff was interested in taking a position with GAPC. Plaintiff agreed to speak to Voecks about it.

After some negotiating with GM, plaintiff agreed to take a position at GAPC as a staff research engineer. Plaintiff's salary was $116,400, and he was given a signing bonus of $15,000. Patrick J. Solomon Affirmation (Docket # 28) Ex. 6. Plaintiff alleges that before accepting GM's offer, he was also given oral assurances that: he would not be fired without just cause; the project would not be terminated, and if it were, plaintiff would be placed into a different job; and he would report directly to Voecks. Plaintiff states that it was important to him that Voecks be his supervisor "[b]ecause of his experience and because of his background and his technical job." Beshty Depo. Tr. (Solomon Aff. Ex. A) at 70. Neither GM's offer letter nor its letter confirming plaintiff's acceptance of that offer set forth any of these alleged assurances, however. *See* Solomon Aff. Exs. 5, 6.

Plaintiff began working at GAPC on December 20, 1999. Beshty Dep. Tr. at 73. On January 7, 2000, GM announced that Voecks was being reassigned to a different project, and that his position with the fuel processor team would be filled by Daniel O'Connell. O'Connell was 42 years old at that time; Voecks was allegedly around age 60.[1] *See* O'Connell Depo. Tr. (Solomon Aff. Ex. G) at 7; Complaint ¶ 14.

Plaintiff alleges that very soon after O'Connell replaced Voecks, it became evident to plaintiff that O'Connell was not interested in working with him. O'Connell rarely spoke to plaintiff, and showed little interest in his input on the project.

In July 2000, O'Connell gave plaintiff his six-month performance review. The review contained some positive assessments, stating, for example, that plaintiff "has done some very good analysis work" and that he was "extremely competent in theoretical analysis and specific modeling areas." Solomon Aff. Ex. 16. It also contained some criticisms, however. For instance, O'Connell stated that plaintiff: "has difficulty accepting opinions that differ from his own and has expressed this in an inappropriate manner"; "has been slow to offer design input"; "has had difficulty adjusting to the GAPC/GM culture"; "has not yet demonstrated the leadership skills required to make his group a high performance team"; "has not ... done well delegating assignments to the members of his team"; and "has not developed close relationships with other members of GAPC." *Id.* Plaintiff (who at that time was supervising a group of about four employees) alleges that O'Connell also orally told him that plaintiff needed to "understand that most of these people [in plaintiff's group] are young people that are straight

from school and they are very sensitive to criticism." Beshty Depo. Tr. at 131. O'Connell also allegedly stated that "people like you and I will be less sensitive to criticism, but younger people are [sensitive] ... they don't take it well." *Id.*

Plaintiff prepared a written rebuttal to his evaluation, which he submitted to O'Connell. Solomon Aff. Ex. 17. He alleges that he asked O'Connell to provide him with specific examples of O'Connell's criticisms of plaintiff, and to give him guidance on how to correct the perceived deficiencies in plaintiff's performance, but that O'Connell never did so.

On October 31, 2000, plaintiff was called to a meeting with some of his supervisors, including O'Connell. O'Connell told plaintiff that his performance had not improved since the six-month review, and that plaintiff was not a good fit at GAPC. Plaintiff was informed that his employment was being terminated, and he was escorted out of the building.

Following plaintiff's termination, GAPC stopped payment on his final paycheck, in the amount of $3216.78. In response to an inquiry from plaintiff, GAPC's human resource manager informed plaintiff by letter dated December 13, 2000, that the "paycheck reflected hours worked for a two-week period minus vacation time taken during the 2000 calendar year. Employees that are released from GM are not eligible for vacation and any time taken prior to the release is to be repaid." Michael J. Lingle Affirmation (Docket # 24) Ex. D.

At some point, plaintiff retained an attorney, who took some steps seeking the moneys allegedly owed to plaintiff. By letter dated June 25, 2001, GAPC sent plaintiff a check for $3216.78. Lingle Aff. Ex. E.

1. In page 7 of his brief in opposition to defendant's motion, plaintiff states that Voecks was age 63 at the time, but there is no citation to where that fact appears in the record.

Plaintiff commenced this action on April 16, 2002, alleging that GM discriminated against him on account of his age, race, national origin and religion. The complaint asserts three federal causes of action, under: (1) the Age Discrimination in Employment Act ("ADEA"), 29 U.S.C. § 621 *et seq.;* (2) Title VII of the Civil Rights Act of 1964 ("Title VII"), 42 U.S.C. § 2000e *et seq.;* and (3) 42 U.S.C. § 1981. Plaintiff also asserts claims under the New York State Human Rights Law ("HRL"), N.Y. Exec. L. § 296, Labor Law § 193, and New York common law theories of breach of contract and fraudulent inducement. Plaintiff seeks back pay, front pay or reinstatement, compensatory and punitive damages, and attorney's fees.

## DISCUSSION

### I. Defendant's Motion for Summary Judgment

### A. Race/National Origin/Religion Discrimination Claims

In his claims under Title VII and § 1981, plaintiff alleges that GM discriminated against him on account of his race, national origin and religion. These claims must be dismissed.

All of these claims are analyzed under the burden-shifting analysis set forth in *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973):

> First, a plaintiff must establish a *prima facie* case of ... discrimination [based on his membership in a protected category]. Once the plaintiff has made out a *prima facie* case, the employer is required to offer a legitimate, nondiscriminatory business rationale for its actions. If the employer articulates such a reason, the plaintiff has the burden of proving that his [membership in the protected category] was the real reason for his discharge.

*Schnabel v. Abramson,* 232 F.3d 83, 87 (2d Cir.2000) (internal citations omitted); *accord Terry v. Ashcroft,* 336 F.3d 128, 137–38 (2d Cir.2003).[2]

In the case at bar, defendant concedes, for purposes of its summary judgment motion, that plaintiff has satisfied the first three prongs of his prima facie case. Defendant contends, however, that plaintiff cannot satisfy the fourth: that the circumstances of his discharge give rise to an inference of unlawful discrimination.[3]

**2.** Plaintiff's claims under the HRL are subject to the same analysis. *See Mandell v. County of Suffolk,* 316 F.3d 368, 377 (2d Cir.2003).

**3.** Defendant also asserts that plaintiff cannot state a claim under § 1981, because that statute only protects against discrimination based on race. Defendant contends that for purposes of § 1981, Arabs are considered to be Caucasian, and plaintiff does not allege that he was discriminated against because he is Caucasian. In support of that assertion, defendant quotes the following from *Saint Francis College v. Al-Khazraji,* 481 U.S. 604, 610, 107 S.Ct. 2022, 95 L.Ed.2d 582 (1987): "a variety of ethnic groups, including Arabs, are now considered to be within the Caucasian race."

GM has taken that statement out of context, however. The Court in *Al-Khazraji* actually *rejected* the defendants' contention in that

case that the plaintiff, an Arab, was a Caucasian and therefore could not allege the kind of discrimination that § 1981 forbids. The Court said that the defendants' "submission rests on the assumption that all those who might be deemed Caucasians today were thought to be of the same race when § 1981 became law in the 19th century; and it may be that a variety of ethnic groups, including Arabs, are now considered to be within the Caucasian race." The Court went on, however, to hold that, "[b]ased on the history of § 1981, we have little trouble in concluding that Congress intended to protect from discrimination identifiable classes of persons who are subjected to intentional discrimination solely because of their ancestry or ethnic characteristics," and that if the plaintiff "on remand can prove that he was subjected to intentional discrimination based on the fact

Since defendant has proffered a legitimate, nondiscriminatory reason for its actions, however—that plaintiff's performance was unsatisfactory—I will proceed to the ultimate issue of whether plaintiff has presented sufficient evidence of pretext to give rise to a genuine issue of material fact. *See United States Postal Service Bd. of Governors v. Aikens,* 460 U.S. 711, 715, 103 S.Ct. 1478, 75 L.Ed.2d 403 (1983) ("Where the defendant has done everything that would be required of him if the plaintiff had properly made out a prima facie case, whether the plaintiff really did so is no longer relevant"); *Wado v. Xerox Corp.,* 991 F.Supp. 174, 187 (W.D.N.Y. 1998) (where defendant proffered legitimate, nondiscriminatory reasons for plaintiffs' terminations, court would "assume that [each plaintiff] ha[d] made out a prima facie case, and proceed to consider whether the plaintiff ha[d] presented sufficient evidence to create a triable issue of fact about whether Xerox's proffered reason [wa]s a pretext for discrimination"), *aff'd,* 196 F.3d 358 (2d Cir.1999).

In so doing, I must "examin[e] the entire record to determine whether the plaintiff could satisfy his 'ultimate burden of persuading the trier of fact that the defendant intentionally discriminated against the plaintiff.' " *Schnabel,* 232 F.3d at 90 (quoting *Reeves,* 530 U.S. at 143, 120 S.Ct. 2097). The court must "analyze the particular evidence to determine whether it reasonably supports an inference of the facts plaintiff must prove—particularly discrimination." Evidence of pretext may be probative of discrimination, *see Reeves,* 530 U.S. at 147, 120 S.Ct. 2097. At the same time, however, evidence satisfying *McDonnell Douglas'*s minimal requirements of a prima facie case plus evidence from which a factfinder could find that the employer's explanation was false does not necessarily

require submission to the jury. *James v. New York Racing Ass'n,* 233 F.3d 149, 157 (2d Cir.2000). The "bottom line" is simply whether, viewing the entire record, it can fairly be said that "the plaintiff can point to evidence that reasonably supports a finding of prohibited discrimination." *James,* 233 F.3d at 154.

Plaintiff's evidence of discrimination based on his race, national origin, or religion can generously be described as scant. Virtually the only evidence he has is his testimony that on one occasion a coworker, Hacin Sennoun (who was also an Arab, *see* Beshty Depo. Tr. at 167), told plaintiff that another employee, John Salvador, had said to Sennoun, "with Beshty coming on board, now you can form an Arab front." Beshty Depo. Tr. at 168.

"To be probative of discrimination, isolated comments must be contemporaneous with the discharge or causally related to the discharge decision making process." *Geier v. Medtronic, Inc.,* 99 F.3d 238, 242 (7th Cir.1996); *see also Wado,* 991 F.Supp. at 212 ("Statements made or actions taken by nondecisionmakers, or actions unrelated to the decision-making process, cannot be used to support an allegation of pretext"). Salvador's alleged statement meets neither criterion.

■ Aside from the fact that Sennoun's statement to plaintiff appears to be inadmissible hearsay, Salvador's alleged remark was made by someone who had no involvement in plaintiff's termination, months before the termination occurred. That is not enough to give rise to a genuine issue of material fact. *See Price Waterhouse v. Hopkins,* 490 U.S. 228, 277, 109 S.Ct. 1775, 104 L.Ed.2d 268 (1989) (statements by nondecisionmakers, or statements unrelated to the decision-making

that he was born an Arab, rather than solely on the place or nation of his origin, or his

religion, he will have made out a case under § 1981." *Id.* at 613, 107 S.Ct. 2022.

process, are insufficient from which to infer discriminatory intent) (O'Connor, J., concurring); *see, e.g., Venti,* 236 F.Supp.2d at 277 (statement by coworker that plaintiff was "too old" to be pregnant did not support inference of discrimination, since it was not connected to employer's decision to terminate plaintiff, and speaker had no responsibility for or input into the decision to terminate plaintiff); *Georgy v. O'Neill,* No. 00 Civ. 0660, 2002 WL 449723, at *6 (E.D.N.Y.Mar.25, 2002) (an alleged reference to national origin by a nondecisionmaker, six months prior to plaintiff's termination, is "the kind of isolated and stray remark insufficient, without more, to raise an inference of discrimination and defeat summary judgment"). Furthermore, there is no evidence that plaintiff or Sennoun ever told any of their supervisors about the alleged remark, so it cannot be said that anyone in a decisionmaking position ratified or endorsed Salvador's alleged statement. *See* Beshty Depo. Tr. at 169.

■ Plaintiff also relies on O'Connell's statement in his six-month review that plaintiff did not fit in to the GAPC/GM "culture." Another supervisor, Annette Marshal, allegedly made a similar comment during the meeting at which plaintiff was informed of his termination. *See* Beshty Depo. Tr. at 155. There is, however, *no* evidence that these statements were indirect references to plaintiff's national origin, race, or religion, aside from plaintiff's speculative, subjective interpretation.

At his deposition, plaintiff testified regarding his interpretation of these references to the GM "culture":

[t]he other sort of characteristic or parameter in what seems to be a culture thing that there was no uniformity ethnic background except for in the group I was in there were some Germans, there were two Indians, one of whom was terminated while I was still there. There was one Chinese or two Chinese that I met in the group. The rest are Caucasian. I did not see African–American professionals.

So it looked to me like a kind of—not a coincidence, but a cultural parameter in what GM culture meant; that implied to me that Asian and racial origin somehow are deliberately selected because of the uniformity of what I've seen in terms of staff.

Beshty Depo. Tr. at 136–37. In other words, because there were not many Arab employees in plaintiff's group (as stated, Sennoun was an Arab), plaintiff inferred that he was perceived as not fitting in because of his ethnicity. Again, that is pure conjecture with no support in the record. Absent some other evidence that plaintiff's race, national origin, or religion had anything to do with the decision to terminate him, these facially neutral references to the GM/GAPC "culture" are simply not probative of discriminatory animus. *See Casanova v. General Mills Restaurants, Inc.,* No. 94–CV–4386, 1997 WL 473840, at *5 (E.D.N.Y. Aug.15, 1997) (two vague comments by plaintiff's supervisor that plaintiff "failed to fit into the Red Lobster family" and that she was "tired of looking at [plaintiff's] face," although "marginally sufficient to meet the minimal burden for a prima facie case, fail to raise a triable issue of fact as to whether race motivated or contributed to Red Lobster's decision to terminate Casanova"); *Kazin v. Metro–North Commuter R.R.,* 1994 WL 68167, at *5 (S.D.N.Y., Mar.1, 1994) (statement that plaintiff, who was Jewish, "did not fit the corporate culture" did not suggest discrimination, since it "ma[d]e no reference at all to Judaism").

In addition, it is important to look at O'Connell's "culture" reference in context. In plaintiff's six-month review, under the category "Leadership," O'Connell wrote:

Bahjat has had difficulty adjusting to the GAPC/GM culture. I have received complaints about his management style and method of dealing with employees/customers. Bahjat has a tendency to control all the data generated and does not share recognition/credit with his team. Bahjat was hired with the expectation that he was capable of leading the modeling group in the FP Team, but he has not yet demonstrated the leadership skills required to make his group a high performance team.

Solomon Aff. Ex 16. Thus, although the use of the word "culture" *could*, in certain circumstances, be suggestive of discriminatory animus, O'Connell's use of it here, in reference to plaintiff's perceived leadership or management abilities, lacks the sinister overtones that plaintiff ascribes to it.

Plaintiff's only other evidence in support of these claims relates to whether defendant's stated reasons for terminating him are pretextual. This evidence mostly concerns minor alleged deviations from GM policies and procedures concerning the timing of performance reviews and the like. Plaintiff has not shown that other similarly situated employees were treated differently in this regard, however, and the alleged procedural irregularities are so minimal that even if a jury were to find that defendant's proffered reason for plaintiff's discharge was pretextual, no rational jury could conclude that the proffered reason was a pretext for discrimination. "It is not enough ... to disbelieve the employer; the factfinder must believe the plaintiff's explanation of intentional discrimination." *Reeves v. Sanderson Plumbing Products, Inc.*, 530 U.S. 133, 147, 120 S.Ct. 2097, 147 L.Ed.2d 105 (2000) (quoting *St. Mary's Honor Center v. Hicks*, 509 U.S. 502, 519, 113 S.Ct. 2742, 125 L.Ed.2d 407 (1993)). *See Stafford v. True Temper Sports*, 123 F.3d 291, 295–96 (5th Cir.1997) ("Stafford does nothing more

than make bare allegations and attempt to argue that a few minor discrepancies in the record constitute proof of improper motive. This simply will not suffice ..."); *Peterson v. City College*, 32 F.Supp.2d 675, 688 (S.D.N.Y.1999) (although plaintiff presented evidence of pretext through minor irregularities in the tenure process, no reasonable jury could conclude that pretext was a mask for illegal discrimination).

## B. Age Discrimination Claim

Plaintiff's ADEA claim is analyzed using the same burden-shifting paradigm as his other discrimination claims, with his age (over 40) constituting the protected category. *See Terry v. Ashcroft*, 336 F.3d 128, 137–38 (2d Cir.2003).

Plaintiff bases this claim largely upon certain remarks made by O'Connell and others about some of plaintiff's team members and coworkers being young and inexperienced. For example, he states that during his six-month review with O'Connell, O'Connell told plaintiff, "[Y]ou understand most of these people [in plaintiff's group] are young people that are straight from school and they are sensitive to criticism.... [P]eople like you and I will be less sensitive to criticism, but younger people are...." Beshty Depo. Tr. at 131. Plaintiff testified that O'Connell "made a point that [plaintiff's] criticism as being an older person to a younger person sort of make him [sic]—is not a good thing, make them on the defensive or become more—cause them some kind of feeling of—he said they don't take it well." *Id.*

Plaintiff also testified that O'Connell made a comparison between plaintiff and Voecks. Although plaintiff's testimony on this was somewhat unclear, it appears that he alleges that O'Connell was· indicating that Voecks (who was roughly plaintiff's age) had also tended to be overly blunt when he disagreed with a younger subor-

dinate's ideas. Plaintiff testified that he "understood [that O'Connell] ... put us as a block of people who criticize younger people because of their experience and age I assumed. I interpreted that that was the analogy between us." *Id.* at 135.

Plaintiff himself seemed to believe that his age was a factor in his difficulty forming close relationships with his team members. He testified that when O'Connell said to him that plaintiff "did not form any relationship with any of the GAPC team members," plaintiff

> said to him that's, you know, that's differential in age between us.
>
> I mean, they are young people who just had a baby or something, that is very difficult to—we had a congenial relationship, but we didn't have—for example, they kept me at arm's length anyway because of the group structure.
>
> They go for a pizza or they go somewhere or they are sometimes sitting in the cafeteria. Unless I go and sit with them, I be sitting, sometimes they come in, they will not volunteer to sit with me.

*Id.*

Plaintiff also testified that during his interviews with Voecks prior to accepting a job at GM, Voecks told plaintiff that "he ha[d] a young group, that he want[ed] someone to mentor the group...." *Id.* at 35. Plaintiff testified that Voecks told him that "he ha[d] a group of very young and bright people that need[ed] some mentor, some direction and [plaintiff] would be very valuable to have on board...." *Id.* at 38.

In addition, plaintiff relies on certain other remarks referencing certain employees' ages. He notes that in a promotion recommendation for one Gary Robb, Robb's supervisor, William Pettit, described Robb as a "strong young engineer who is a key member in the organization." Solomon Aff. Ex. D(46). When Robb was made a team leader, he wrote to his team

members, "I realize that I am younger and have much less experience than most of you and I promise to keep that in mind." *Id.* Ex. D(45). Plaintiff alleges a few similar remarks by various persons, all in the same vein.

As with his other discrimination claims, plaintiff again interprets the references to the GM/GAPC "culture" as indicative of discriminatory animus. He testified,

> The only thing I've noticed about the collective place to indicate the culture to me is the uniformity of younger age throughout. I did not meet anybody in the group that is of my age or with gray hairs. Everybody is young.
>
> There is a uniformity of age and they seem to be of the same age which is ranging twenty-seven, twenty-eight, thirty, that kind of thing.

Beshty Depo. Tr. at 136.

Viewing this evidence in its entirety, even in the light most favorable to plaintiff, I find that it does not give rise to a genuine issue of fact about whether plaintiff was terminated on account of his age. As to the various comments about age, youth, inexperience, etc., "[i]t is clear that not every comment concerning a person's age presents direct evidence of discrimination." *Young v. General Foods Corp.*, 840 F.2d 825, 829 (11th Cir.1988), *cert. denied*, 488 U.S. 1004, 109 S.Ct. 782, 102 L.Ed.2d 774 (1989); *see, e.g., Bodenheimer v. PPG Industries, Inc.*, 5 F.3d 955, 958 (5th Cir.1993) (comment that plaintiff's supervisor made to plaintiff regarding retirement benefits when plaintiff was terminated, that "Cliff, I hope when I get to your age, somebody does the same thing for me," proved only that supervisor desired a similar retirement package upon his retirement, and "shed[ ] absolutely no light on the central issue" of "whether Bodenheimer's age was a factor in [the supervisor's] decision to terminate him");

*Barnes v. Southwest Forest Indus. Inc.*, 814 F.2d 607, 610–11 (11th Cir.1987) (defendant's statement to plaintiff that he would have to take another physical examination "and at your age, I don't believe you could pass it," was not direct evidence of discrimination). *E.E.O.C. v. Texas Instruments*, 100 F.3d 1173, 1181 (5th Cir.1996) (holding that an employer's statement about an employee's age making him eligible for retirement "simply recognized a fact concerning [the employee's] seniority, an observation which did not imply seniority was the reason for discharge").

I realize that there is a distinction between direct and indirect evidence of age discrimination, and that even a facially neutral comment *may* constitute indirect evidence of animus. *See Turner v. Housing Authority of Jefferson County*, 188 F.Supp.2d 1066, 1080 (S.D.Ill.2002) (citing *Pafford v. Herman*, 148 F.3d 658, 666 (7th Cir.), *cert. denied*, 525 U.S. 1020, 119 S.Ct. 548, 142 L.Ed.2d 455 (1998)) (additional citations omitted). Nevertheless, the comments relied upon here are so innocuous, and there is so little other evidence of age bias, that plaintiff cannot overcome defendant's motion for summary judgment.

First, the alleged statements by O'Connell about plaintiff's team members being "young people that are straight from school" who were "sensitive to criticism" cannot reasonably be viewed as evidence of discriminatory animus. The gist of these statements was simply that plaintiff needed to be more tactful with, and less openly critical of, his team members. The same criticism could easily have been leveled at a young supervisor. O'Connell's statements may indicate a certain stereotyping of young adults as thin-skinned (which hardly evidences bias in favor of them), but, whether O'Connell's perception in that regard was accurate or not, his criticisms of plaintiff were focused not on plaintiff's age, but on his perceived lack of tact in dealing with his subordinates. *See Byrom v. Accenture, Ltd.*, No. Civ.A.3:02–CV–0124, 2003 WL 22255669 (N.D.Tex. Sept.29, 2003) (question by interviewer about whether plaintiff would have a problem working with someone younger than he was was "only vaguely age-related, as [it] touch[ed] upon Byrom's comfort working with Accenture's younger workers rather than any animus based on Byrom's age").[4]

There was an age difference between Beshty and his charges, but that is not evidence of age bias. Plaintiff's own deposition testimony indicates that, if anything, *he* believed that his age was an impediment to his forming close relationships with his team members. When O'Connell expressed concern about plaintiff's failure to form solid relationships with his subordinates, *plaintiff* explained this in age-related terms: that it was the "differential in age between us," and that his team members were "young people who just had a baby or something." *See Mills v. First Fed. Sav. & Loan Assoc. of Belvidere*, 83 F.3d 833, 841–42 (7th Cir.1996) (employee's self-serving affidavit that "[my supervisor] mentioned something about management's concern that we may not be able to keep up with the regulations. I took this to mean it was because of our age" could not defeat summary judgment because the statement merely evidenced plaintiff's sub-

---

4. In one of O'Connell's own performance reviews (which appears to have been issued after plaintiff was terminated), his supervisor wrote that O'Connell needed to work on "developing a more confident, less sensitive style of interaction." Solomon Aff. Ex. 103. This suggests that O'Connell was indeed concerned, perhaps even overly so, about not hurting his subordinates' feelings. It is not surprising, then, that he would view a lack of such sensitivity in plaintiff as a problem that needed to be corrected.

jective belief that she was terminated due to her age).

The other statements about age are equally unremarkable. Voecks's statements that "he ha[d] a group of very young and bright people that need[ed] some mentor, some direction and [that plaintiff] would be very valuable to have on board" simply indicated that this was a group of relatively inexperienced people who could use a veteran captain at the helm. This statement was, in fact, *favorable* to plaintiff, as it conveyed that plaintiff's experience made him a good choice for the job. Moreover, it was Voecks who was primarily responsible for hiring plaintiff in the first place, so to interpret these statements as evidence of discriminatory animus on his part would be ludicrous.

Similarly, Gary Robb's statement to his colleagues that "I realize that I am younger and have much less experience than most of you and I promise to keep that in mind" hardly smacks of boastfulness. If anything, Robb was simply trying to convey that he did not intend to rule by fiat, but that he would be open to the ideas and suggestions of others, particularly those with more experience than he.

In addition, Pettit's reference to Robb as a "strong young engineer who is a key member in the organization," even if it could be construed as commenting favorably on Robb's youth, is nothing more than a stray remark by a person who was not involved in the decision to terminate plaintiff. Pettit was merely plaintiff's coworker, and there is no evidence that he had any input into the decision to discharge plaintiff. His statement about Robb likewise has no bearing on the decision concerning plaintiff. *Price Waterhouse v. Hopkins*, 490 U.S. 228, 277, 109 S.Ct. 1775, 104 L.Ed.2d 268

The fundamental problem with plaintiff's position is that he attempts to view *any* references to age as evidence of discrimi-

natory animus. Voecks's description of his subordinates as a "young group" was no more than a statement of fact. He did not imply that those employees were somehow preferable because they were young, but only that they were relatively inexperienced, and needed mentoring. Although plaintiff takes issue with defendant's assertion that Voecks and others used the adjective "young" as a synonym for "inexperienced," the obvious fact is that young employees are—indeed, *must* be—relatively inexperienced, simply because they *are* young; and have not had a chance to gain a great deal of experience. To hold that references to youth as innocuous as the ones in this case are evidence of age bias would place on employers the undue burden of taking pains to ensure that supervisors excised the word "young," and any variants thereof, from their language. The case law does not support such a result. *See Turner v. North American Rubber, Inc.*, 979 F.2d 55, 59 (5th Cir.1992) (holding that an employer's reference to younger employees as "three young tigers" was not enough to show age discrimination).

Plaintiff's interpretation of the references to the GM/GAPC "culture," and to plaintiff's inability to "fit in" is also no more persuasive as to his ADEA claim as it is to his other discrimination claims. The only basis for his inference that these references were allusions to youth is plaintiff's observation that most of the other employees at GAPC were younger than he. Without more, that is simply too speculative to give rise to an issue of fact. *See, e.g., Fortier v. Ameritech Mobile Comms., Inc.*, 161 F.3d 1106, 1113 (7th Cir.1998) (supervisor's statements that it was time for "new blood," and that plaintiff's (younger) replacement "had a lot of energy" did not raise genuine issue regarding whether plaintiff's termination was motivated by age discrimination); *Frieze v. Boatmen's*

*Bank of Belton*, 950 F.2d 538, 542 (8th Cir.1991) (supervisor's statements about plaintiff not being able to fit into bank's framework were too vague to create a reasonable inference of age discrimination); *Ranieri v. Highland Falls–Fort Montgomery Sch. Dist.*, 198 F.Supp.2d 542, 544–45 (S.D.N.Y.2002) (comment by school superintendent that high school coach did not fit into school's long term program, without more explanation or other evidence of discrimination, was insufficient to show that employer's legitimate, nondiscriminatory reason for declining to rehire coach was pretext for age discrimination); *Ragland v. Rock–Tenn Co.*, 955 F.Supp. 1009, 1022 (N.D.Ill.1997) ("We find it ... difficult to read age into a comment about 'fitting in.' The remark is objectively neutral and unaccompanied by any other evidence of age bias").

Plaintiff also claims that younger employees at GAPC were treated more favorably than older workers. Virtually his only evidence in support of this assertion is that O'Connell's own six-month performance review indicated that he needed to work on certain management skills. *See* Solomon Aff. Ex. 103. On the whole, however, the review was favorable, and stated that O'Connell "does possess the inherent skill sets to be a very effective leader," and that he simply "need[ed] to continue his growth" in that regard.

Plaintiff's overall performance, on the other hand, was deemed "unsatisfactory." Solomon Aff. Ex. 16. At any rate, it appears that O'Connell's supervisor ultimately decided that O'Connell had made sufficient strides in the recommended direction, whereas O'Connell concluded that

plaintiff had not. As stated, it is not the proper function of this Court to "act as a superpersonnel department that second guesses employers' business judgments" about whether an employee's performance is adequate. *Byrnie v. Bd. of Educ.*, 243 F.3d 93, 103 (2d Cir.2001).

Plaintiff also contends that Voecks was himself a victim of age discrimination because his replacement by O'Connell, and transfer to a different position, amounted to a demotion.[5] Assuming *arguendo* that it was a demotion, however, plaintiff has presented no evidence that Voecks's age was a factor, nor is this one personnel move, involving a transfer (rather than termination) of a differently situated employee enough to show that age discrimination was behind plaintiff's termination. *See Wyvill v. United Companies Life Ins. Co.*, 212 F.3d 296, 302 (5th Cir.2000) (anecdotal evidence about other employees cannot establish that discrimination was a company's standard operating procedure unless those employees are similarly situated to the plaintiff); *see also Alleyne v. Four Seasons Hotel—New York*, No. 99 CIV. 3432, 2001 WL 135770, at *12 (S.D.N.Y. Feb.15, 2001) (plaintiff's allegations of discrimination against three other individuals did not create an issue of material fact as to whether defendant's proffered reasons for its decision not to promote the plaintiff were pretextual), *aff'd*, 25 Fed.Appx. 74 (2d Cir.2002).

██ Finally, I note that plaintiff has proffered what purports to be statistical evidence of age discrimination. Specifically, plaintiff has presented evidence that out of 175 employees that have been employed by GAPC since January 1, 1997, 68

---

**5.** Voecks himself testified that he considered the transfer "a lateral move" and that his pay did not change as a result. Voecks Depo. Tr. (Solomon Aff. Ex. B) at 23. His supervisor, however, testified that Voecks did take a cut in pay, *see* Fronk Depo. Tr. at 80, although it is not entirely clear if he was talking about the same transfer as Voecks was. At any rate, even assuming that the move was a demotion, that does not save plaintiff's claim, for the reasons stated in the body of this Decision and Order.

have been age 40 or older, and that of that number, 11 have been age 50 or older, and two (other than plaintiff) have been over 60. Solomon Aff. Ex. 67.

Absent some evidence that older employees were turned down for jobs, or terminated, in disproportionate numbers, however, these figures are meaningless. They are nothing more than raw data that provide no guidance whatsoever in determining whether GM discriminates against older employees. *See Weinstock v. Columbia University*, 224 F.3d 33, 46 (2d Cir.2000) (rejecting contention that "raw data purportedly describing a pattern of under-representation and unequal opportunity for women faculty at Columbia leads to the conclusion that gender discrimination is in play here"), *cert. denied,* — U.S. ——, 124 S.Ct. 53, 157 L.Ed.2d 24 (2003); *Odom v. Frank,* 3 F.3d 839, 849 (5th Cir. 1993) (raw data of age, race, and location of persons promoted in Postal Service's inspection service over several years was not "statistical evidence," and was not, without more, competent to prove age or race discrimination, as it was simply impossible to determine what data was supposed to mean, much less to determine that it indicated discrimination).

By dismissing plaintiff's discrimination claims, the Court does not mean to minimize or trivialize the predicament in which plaintiff found himself. Certainly he was understandably upset that he had left a steady job at Merck with the expectation of long-term employment at GM, only to be terminated within a year. The discrimination statutes, however, "do[ ]n't guard against unwise or unfair decisions unless those decisions also were discriminatory or retaliatory." *Place v. Abbott Labs.,* 215 F.3d 803, 811 (7th Cir.2000), 531 U.S. 1074, 121 S.Ct. 768, 148 L.Ed.2d 668 (2001). Even if plaintiff were justified in thinking that he had been treated badly, then, "it is not within the power granted to federal courts to right every wrong that may be inflicted on individuals in our society." *McFarlin v. Newport Special School Dist.,* 784 F.Supp. 589, 593 (E.D.Ark.), *vacated on other grounds,* 980 F.2d 1208 (8th Cir. 1992). As Judge Hill of the Eleventh Circuit has put it:

> an individual employee may be given a "raw deal" in a personnel action in the absence of any discrimination forbidden by law.... The temptation to decide ... who is "right," the boss or the employee, should be resisted ... even where the employee who is unfairly treated is a member of a protected group. If the "raw deal" was not related to ... race, federal law and federal courts are not implicated.

*Roberts v. Gadsden Memorial Hosp.,* 835 F.2d 793, 802 (11th Cir.1988) (Hill, J., concurring). Here, even if a factfinder might conclude that plaintiff was ill-used, there is no evidence that he was the victim of unlawful discrimination. His discrimination claims must therefore be dismissed.

## C. Breach of Contract Claim

Plaintiff asserts a breach of contract claim based on GM's alleged promises that: "he would not be fired because GAPC does not fire without just cause," Complaint ¶ 11; and he would report to Gerald Voecks. Neither of these allegations supports a claim.

As to the alleged promise that plaintiff would not be terminated without just cause, plaintiff's employment application, which he signed, stated, "I understand that any position offered by GM will be considered at-will, terminable by GM or myself for any reason not prohibited by applicable law." Defendant's App. to Local Rule 56.1 Statement Ex. A(3).[6] A "sig-

---

6. Exhibit A to Defendant's Rule 56.1 Appendix consists of excerpts of plaintiff's deposition testimony. "A(3)" refers to Deposition Exhibit 3.

natory to a contract is presumed to have read, understood and agreed to be bound by all terms ... in the documents he or she signed." *Sun Forest Corp. v. Shvili,* 152 F.Supp.2d 367, 382 (S.D.N.Y.2001) (quoting *Orix Credit Alliance, Inc. v. Brown,* No. 93 Civ. 1019, 1994 WL 392240, at *4 (S.D.N.Y. July 27, 1994)). At any rate, plaintiff testified that he did read the application before he signed it. Beshty Depo. Tr. at 52.

This express provision explaining that plaintiff's employment was at-will forecloses plaintiff's breach of contract claim based on the alleged "just cause" promise. *See O'Reilly v. Citibank, N.A.,* 198 A.D.2d 270, 271, 603 N.Y.S.2d 572 (2d Dep't 1993) (plaintiff had no cause of action for breach of oral employment contract, where employment application clearly stated that "the duration of your employment is at the discretion of the Employer, and therefore may be terminated at any time," and personnel handbook did not provide that dismissal would be for just and sufficient cause only); *Tiranno v. Sears, Roebuck & Co.,* 99 A.D.2d 675, 472 N.Y.S.2d 49, 50 (4th Dep't.1984) (lower court should have granted summary judgment for defendant on plaintiff's claim for breach of an oral employment contract, since the employment application that the plaintiff completed when hired by defendant stated, "[M]y employment and compensation can be terminated with or without cause").

In addition, even if GM *had* orally indicated that plaintiff would not be terminated without cause, that is not enough. "Oral assurances that an employee will only be terminated for cause do not, by themselves, overcome the presumption that the relationship is at-will." *Kempf v. Mitsui Plastics, Inc.,* No. 96 Civ. 1106, 1996 WL 673812, at *6 (S.D.N.Y. Nov. 20, 1996).

Plaintiff's own deposition testimony is also at odds with his allegation that he was promised that he would not be terminated without just cause. He testified that when the recruiter first approached him about the job at GAPC, plaintiff told him that he was concerned about the possibility of layoffs. Beshty Depo. Tr. at 34. The recruiter told him that the project plaintiff would be working on was "very different" from the areas where layoffs were occurring. *Id.* When plaintiff met with Voecks, Voecks gave him similar assurances that the project was "quite outside the union problem" and therefore unlikely to be the target of layoffs. *Id.* at 37. All that indicates, then, is that plaintiff was given assurances of job security in the sense that he would not be laid off, not that he could not be terminated for other reasons.

Plaintiff testified that it was his "understand[ing] that "termination has a good reason for it," and that he "didn't expect" that he could be terminated without cause. *Id.* at 55–57. He did not testify, however, that anyone at GM ever told him anything to that effect. On the contrary, no one ever told him that his employment at GM was for any specific time period, *id.* at 81, and plaintiff's signing bonus agreement, which he signed, stated, "If your employment with General Motors is terminated within the first 12 months for any reason, 100% of the signing bonus must be repaid to General Motors." Defendant's Rule 56.1 App. Ex. A(7). Plaintiff was plainly put on notice, then, that his continued employment at GM was not assured. *See Gambello v. Time Warner Communications, Inc.,* 186 F.Supp.2d 209, 224–25 (E.D.N.Y.2002) (dismissing plaintiff's claim that defendants breached oral promise to allow him to work until he retired; "this durational term is not legally and experientially limited and ascertainable by objective benchmarks," and since even plaintiff admitted that his "employment was not of a specific duration," plaintiff was an at-will employee).

In addition, the evidence shows that plaintiff *was* terminated for cause: his unsatisfactory performance. Plaintiff may disagree with his supervisors' assessment of his performance, but that does not change the fact that he was fired for cause. In fact, even if his supervisor's assessment of his performance was off the mark, that does not entitle plaintiff to relief. "Employers should be free to remove a person that they honestly (even if erroneously) consider a poor performer without being subjected to liability merely because the individual is a member of a protected classification." *Crawford–Mulley v. Corning Inc.*, 194 F.Supp.2d 212, 222 (W.D.N.Y. 2002); *see also Montana v. First Fed. Savings and Loan Assn. of Rochester*, 869 F.2d 100, 106 (2d Cir.1989) (federal courts do not have a "roving commission to review business judgments") (quoting *Graefenhain v. Pabst Brewing Co.*, 827 F.2d 13, 21 n. 8 (7th Cir.1987)); *Dister v. Continental Group, Inc.*, 859 F.2d 1108, 1116 (2d Cir.1988) ("Evidence that an employer made a poor business judgment generally is insufficient to establish a question of fact as to the credibility of the employer's reasons"); *Mesnick v. General Electric Co.*, 950 F.2d 816, 825 (1st Cir.) ("[c]ourts may not sit as super personnel departments, assessing the merits—or even the rationality—of employers' non-discriminatory business decisions"), *cert. denied*, 504 U.S. 985, 112 S.Ct. 2965, 119 L.Ed.2d 586 (1992).

■ Plaintiff's claim that GM breached its alleged promise that Voecks would be plaintiff's supervisor must also be dismissed. By plaintiff's own admission, GM never promised him that Voecks would be his supervisor for any set length of time, or that Voecks would never be moved or replaced. Beshty Depo. Tr. at 71–72. Plaintiff testified that he "expected" Voecks to remain his supervisor for longer than he did, *id.* at 72, but there is no evidence that GM actually made him any

promises in that regard. At most, having Voecks as plaintiff's supervisor was simply one of the terms or conditions of his employment, and as such, was subject to unilateral modification by GM. "The terms of an at-will employee's employment may be modified at any time. The employee's only option is to terminate the relationship; by continuing to remain as an employee, the employee will be deemed to have ratified the new relationship." *Kempf*, 1996 WL 673812, at *6 (citing *Bottini v. Lewis & Judge & Co.*, 211 A.D.2d 1006, 1008, 621 N.Y.S.2d 753 (3d Dep't 1995)).

### D. Fraudulent Inducement Claim

■ Plaintiff also asserts that he was fraudulently induced to leave his prior job at Merck and accept employment with GM. In order to recover on this claim, plaintiff must show " 'representation of a material existing fact, falsity, scienter, deception and injury.' " *Dalessio v. Kressler*, 6 A.D.3d 57, 773 N.Y.S.2d 434, 437 (2d Dep't 2004) (quoting *Channel Master Corp. v. Aluminium Ltd. Sales*, 4 N.Y.2d 403, 407, 176 N.Y.S.2d 259, 151 N.E.2d 833 (1958)); *accord Manliguez v. Joseph*, 226 F.Supp.2d 377, 390 (E.D.N.Y.2002).

Plaintiff's fraudulent inducement claim is based largely on the same alleged false promises as his contract claim. For the reasons already stated with respect to the contract claim, plaintiff cannot show that any of those statements were false.

In addition, GM's alleged statements to plaintiff that the project was adequately funded and that he would not be laid off were true. Plaintiff was not laid off, nor was the project itself terminated.

There is also no evidence that GM knew that Voecks would be replaced by O'Connell when it made the alleged promises to plaintiff in Summer 1999. The decision to replace Voecks was not announced until

January 2000. It should also be noted that Voecks was the person who made the decision to hire plaintiff, *see* Solomon Aff. ¶ 34, Voecks Depo. Tr. (Solomon Aff. Ex. B) at 68, and there is no evidence that he expected to be replaced or reassigned when he interviewed plaintiff. In fact, Voecks said it came as a surprise to him when he was moved to a different position. *See* Voecks Depo. Tr. at 23.[7]

### E. Labor Law Claim

New York Labor Law § 193 provides that, with certain exceptions that are not applicable here, "[n]o employer shall make any deduction from the wages of an employee," or "make any charge against wages . . . ." Plaintiff says that GM violated this section by stopping payment on his final paycheck.

Plaintiff admits that GM ultimately paid him the full amount of that check, prior to the commencement of this action, but he contends that he is entitled to attorney's fees and liquidated damages under Labor Law § 198(1–a), which provides that

> [i]n any action instituted upon a wage claim by an employee or the commissioner in which the employee prevails, the court shall allow such employee reasonable attorney's fees and, upon a finding that the employer's failure to pay the wage required by this article was willful, an additional amount as liquidated damages equal to twenty-five percent of the total amount of the wages found to be due.

Plaintiff seeks $804 in liquidated damages under this section, plus attorney's fees and prejudgment interest.

I conclude that this statute has no application to the case at bar, for the simple reason that there was no "action instituted upon a wage claim" here. It appears that plaintiff's attorney simply wrote to GM demanding payment of the amount of plaintiff's last paycheck, and GM (without conceding liability or wrongdoing) complied with that request.

The New York Court of Appeals has held that the attorney's fees and·liquidated damages provisions of § 198(1–a) "are limited to actions for wage claims founded on the substantive provisions of Labor Law article 6." *Gottlieb v. Kenneth D. Laub & Co.*, 82 N.Y.2d 457, 464, 605 N.Y.S.2d 213, 626 N.E.2d 29 (1993). *See also Wallace v. BMO Nesbitt Burns Corp.*, No. 01 CIV 7998, 2002 WL 32063120, at *4 (S.D.N.Y. Nov.25, 2002) (" § 198 does not provide a party with the ability to recover wages or income, but only costs and attorneys' fees incidental to an action to enforce some other provision of the Labor Law"); *Scheer v. Kahn*, 221 A.D.2d 515, 517, 634 N.Y.S.2d 148 (2d Dep't 1995) (plaintiff was not entitled to liquidated damages under § 198(1–a), since "none of the plaintiff's causes of action [wa]s based on the substantive provisions of the Labor Law. Indeed, the only causes of action based on the Labor Law [we]re for costs, attorney's fees, and liquidated damages which do not come under the substantive provisions of Labor Law § 198(1–a)").

Here, as stated, there never was an independent action to enforce the substantive provisions of the Labor Law, nor could there have been, since plaintiff received the full amount of his final paycheck before this action was commenced. Although the complaint on its face asserts a claim under Labor Law § 193, plaintiff is not entitled to relief under that section, nor was he entitled to such relief at the time the complaint was filed, since the claim had already become moot.

---

**7.** Voecks's supervisor in his new position, Matthew Fronk, testified that he and O'Connell discussed the possibility of O'Connell taking over Voecks's position in November or December 1999. Fronk Depo. Tr. (Solomon Aff. Ex. E) at 80.

## CONCLUSION

Defendant's motion for summary judgment (Docket # 17) is granted, and the complaint is dismissed.

Plaintiff's cross-motion for partial summary judgment (Docket # 21) is denied.

IT IS SO ORDERED.